(No. 15929.—Reversed and remanded.)
THE DIME SAVINGS AND TRUST COMPANY, Appellant, *vs.*
CARL KNAPP, Appellee.

*Opinion filed October 28, 1924.*

1. CLOUD ON TITLE—*when affidavit is not sufficient to make unknown persons parties to suit to quiet title.* An affidavit is not sufficient to make unknown heirs or devisees parties to a suit to quiet title where it merely states that the unknown heirs and devisees of certain deceased persons "are severally persons who are interested in the above entitled cause whose names are unknown," without stating as a fact that the deceased persons named left unknown heirs or devisees, where such fact was known to the affiant.

2. SAME—*Chancery act requires two affidavits to make unknown persons parties defendant to suit to quiet title.* To make unknown persons parties defendant to a suit to quiet title the Chancery act contemplates the filing of two affidavits, one under section 7, to authorize the suit against persons whose names are unknown by the name and description of unknown owners or unknown heirs or devisees of any deceased person, and another under section 12, to warrant notice to parties defendant by publication.

3. SAME—*purchaser is not chargeable with notice of record of a deed by stranger to title.* A purchaser of land is not chargeable with notice of the record of a deed, mortgage or other instrument by a stranger to the title of his grantor.

4. SPECIFIC PERFORMANCE—*an abstract need not show a perfect paper title.* It is not necessary, in order to establish a good title, that an abstract show a perfect paper title, where the defects are cured by existing facts or lapse of time.

5. SAME—*general rule as to when equity will grant specific performance.* The specific performance of a contract to convey land is as much a matter of course as an action of damages for its breach, and a court of equity will ordinarily grant such relief where the contract is valid at law, fairly entered into and unobjectionable in any of those features which address themselves to the chancellor's discretion.

APPEAL from the Circuit Court of Iroquois county; the Hon. FREDERICK A. HILL, Judge, presiding.

J. W. KERN, and C. G. HIRSCHI, for appellant.

W. E. LEWIS, FREE P. MORRIS, and ROSCOE C. SOUTH, for appellee.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

The Dime Savings and Trust Company, as the executor of and trustee under the last will and testament of Cyrus N. Roberts, deceased, filed its amended bill of complaint against Carl Knapp in the circuit court of Iroquois county for the specific performance of a contract for the sale to Knapp of 200 acres of land in that county. A demurrer to the amended bill was sustained, the trust company elected to stand by its bill, and the bill was dismissed for want of equity. The trust company appealed to this court, and the decree was reversed and the cause remanded, with directions to overrule the demurrer. (*Dime Savings and Trust Co.* v. *Knapp,* 307 Ill. 432.) Knapp answered the bill and later substituted an amended answer, to which a replication was filed. The cause was heard on the merits and the amended bill was dismissed for want of equity. The trust company has again appealed to this court.

The allegations of the amended bill of complaint are set forth in the opinion in *Dime Savings and Trust Co.* v. *Knapp, supra,* and it is unnecessary to repeat them here. Knapp, the appellee, by his amended answer denies that a complete contract, fair and definite in its provisions, was entered into by the parties. In support of this contention he avers, in substance, (1) that appellant represented that the market value of the land was $350 per acre and that it had a party who was ready and willing to pay that price for the land, whereas its actual value did not exceed $250 per acre; that appellant promised, since appellee had no ready money, to lend him approximately $20,000, without which he could not consummate the purchase, but that when requested appellant refused to make the loan, and that ap-

pellee, relying upon the promise and representation so made by appellant, signed the contract; (2) that appellee cannot read nor was the contract read to him, and that he did not know or understand its contents; (3) that appellee is a member of a religious organization which is conscientiously opposed to litigation of any character, that appellant's trust officer threatened to sue him for heavy damages if he did not sign the contract, and that the threat so frightened him that he signed it under duress; and (4) that the decree in the suit to quiet title, based on constructive service, is not final, and hence appellee is not obliged to accept the title based on such a decree.

Cyrus N. Roberts, owner of the land here involved, died testate at Peoria on January 18, 1920. His will was admitted to record by the probate court of Peoria county on February 20, 1920. Appellant was appointed and qualified as the executor of the will, by which it was given full power and authority to sell and convey the testator's real property. After appellant's appointment it advertised the land for sale. On July 12, 1920, appellee wrote appellant a letter in which he stated that he had read the advertisement and asked the price and terms of payment. Appellant, by C. W. Frazier, its trust officer, replied the next day, stating that it had not placed any definite price on the land but that it had a number of offers which it was considering; that it invited an offer from appellee, which would be given due consideration; that it could sell upon a small initial payment, with one-third cash on March 1 following, when possession would be given, and that the balance could be paid in one, two and three years, with interest at six per cent. Three days later appellee appended to the foregoing letter an offer of $305 per acre for the land. Receiving no reply, he wrote again on July 29, 1920, stating that if appellant did not wish to sell to him he would like to rent the land, because he had farmed 80 acres of it for four years. On August 10 appellant replied, stating that

its committee had authorized a price of $350 per acre for the land, and requesting from appellee, if interested in its purchase, an early answer. Appellee then went to Peoria, where appellant is located, and there on August 13 addressed a letter to appellant by which he offered $330 per acre for the whole tract of 200 acres and $335 per acre for the south three 40-acre tracts, payable one-third in cash and the balance in five years, with interest at six per cent. Appellant answered on August 17, stating that its committee was not disposed to accept less than the original price of $350 per acre; that several persons were figuring on the land; that Frazier expected to call on the tenant within a few days, and that if the land had not then been sold he would call on appellee. Frazier visited appellee at his home on August 25, and after some discussion appellee purchased the land for $70,000, or at $350 per acre, payable $1000 on that day, one-third of the balance on or before March 1, 1921, and the remainder in five years, with interest at six per cent. Appellee paid Frazier on the same day the initial $1000, and secured from him a receipt acknowledging its payment and embodying the substance of the agreement. On September 2, 1920, appellant sent appellee a draft of the contract of sale in duplicate, and requested, if it was satisfactory, that he sign both, retain one and return the other to appellant. Two days later, at the request of appellee, Guy Brown, assistant cashier of the Claytonville State Bank, wrote appellant with reference to the contract, stating that appellee objected to paying interest on the purchase money mortgage semi-annually, and also to the forfeiture clause, and that he desired the privilege of making payment of the principal at any time. The contract was enclosed in order that the suggested changes might be made, with the request that the contract, when amended, be mailed directly to appellee. On September 7, 1920, appellant replied that the changes suggested, except the one with reference to forfeiture, had been made. The forfeiture clause,

it was stated, was the usual one, and a blank contract in proof of the assertion was sent. The abstract of title was also enclosed, with the suggestion that appellee could, if he wished, have it examined before signing the contract. Appellee took the abstract to Sam A. Brown, president of the Iroquois County State Bank, and after a conference with him it was sent to Stephen C. Malo, a lawyer, for examination. On October 8, 1920, appellee, by letter, returned the abstract to appellant with his attorney's opinion thereon. This opinion set forth certain objections to the title. These objections, he stated, could not, in the judgment of his attorney, be removed without a suit to quiet title. Not having received a reply, appellee again addressed appellant on October 27, 1920, and inquired whether it intended to clear the title. Shortly thereafter attorney Malo went to Peoria and had an interview with certain officers of appellant, at which the objections he had urged to the title were discussed. In a few days he was notified by appellant to perfect the title. Still later, on December 17, 1920, following correspondence, appellee, two of his sons, Malo, Frazier and Sam A. Brown met at the bank of the last named, at Cissna Park. Frazier produced a formal contract signed by appellant's president in its behalf, and at this meeting it was also signed by appellee. The contract, after reciting the possession by appellant of the land in question, appellant's belief that the title thereto is good and merchantable, the purchase of the land by appellee upon the terms set forth in the receipt of August 25, 1920, except that he should pay all taxes subsequent to 1920, the examination of the abstract by appellee's attorney, and the advisability, in his judgment, before appellee complete the purchase, of obtaining at appellant's expense a decree from the circuit court of Iroquois county removing certain objections which he made to the title, provides: (1) That appellant "will employ the attorney of the party of the second part, to-wit, Mr. Stephen C. Malo, of Watseka, Illinois, to file a bill

quieting said title as to the objections thereto raised by him, which it understands will make the title to said premises as shown by said abstract acceptable to said party of the second part;" (2) that "when the said decree is rendered," final payment will be made by appellee in accordance with the terms agreed upon; and (3) that appellee shall enter into possession on March 1, 1921, and farm the land as the tenant of appellant; that the tenancy shall exist "only until such time as such decree quieting the title shall have been rendered" and the sale consummated, but should appellee fail to complete payment prior to March 1, 1922, he shall on that day pay to appellant as rental for the year ending March 1, 1922, a sum equal to six per cent on $69,000 and the taxes for 1921. After the contract had been signed Malo made preparations to begin suit to quiet the title to the land. The bill was filed on May 10, 1921, and on the 21st of June following, the decree was entered. Other things also were done to remove objections to the title, and the abstract was continued to show these things and the proceedings in the suit. Appellee was notified and requested to consummate the purchase by the first day of July. He replied on June 25, 1921, that he would be unable to do so by that time; that the title would have to be examined again and that he required time to arrange for a loan. Again, on July 2, 1921, in reply to a letter from appellant, he wrote that he could not make settlement by July 6, and repeated that the examination of the title and the making of a loan required time. To this letter he added the postscript: "Will also kindly ask you if you would make the loan for six per cent even, without commission, the way you promised me at first." On August 5, 1921, an attorney other than Malo addressed appellant at appellee's request. He returned the abstract and stated that appellee would like to lease the land for 1922 for the usual grain rental. Subsequently, on October 19, 1921, appellant tendered performance of the contract of sale on its

part. The tender was refused by appellee, and this suit for the specific performance of the contract followed.

Knapp, the appellee, at the time he purchased the land in question had lived upon an adjoining farm more than twenty years. He owned contiguous lands to the east, south and west. At times he had threshed and performed other work on the land and had cultivated part of it as a tenant. He opened negotiations for its purchase by his letter of July 12, 1920, offered $305 per acre by his letter of July 16, went to Peoria with his son on August 13 and offered $330 per acre for the whole or $335 per acre for 120 acres of the tract, and finally, on August 25, purchased the land for $350 per acre, the original price asked by appellant. The purchase was not concluded hastily. More than six weeks elapsed from the time appellee answered the advertisement offering the land for sale until he made the initial deposit of $1000. It is extremely doubtful whether any person possessed greater knowledge or information concerning the land, the character and quality of its soil, the uses to which it could be put, and its value, than appellee. His desire to purchase may have been due in large measure to his long residence across the highway from the land, his intimate knowledge of it and his ownership of contiguous tracts, yet he concluded his negotiations to purchase the land with caution and deliberation. The record does not sustain the contention that in making the purchase he relied upon any representation by appellant either concerning the value of the land or offers by other persons therefor.

Appellee contends that appellant promised, at the time the sale was made, to lend him approximately $20,000 to enable him to consummate the purchase. Appellant denies that any such promise was made. Neither the receipt of August 25, 1920, nor the formal contract of December 17, 1920, makes mention of a loan by appellant to appellee. None of the letters written by appellee during the negotiations which culminated in the contract made any reference

to a loan. Appellee's reply of September 4, 1920, written by Brown, assistant cashier of the Claytonville bank, to appellant's letter of the 2d, which enclosed a draft of the contract in duplicate, evinces a careful examination of the contract and requests certain changes in it, yet nothing is said of the omission of any provision concerning a loan. On January 18, 1921, after the contract had been signed, appellee made application in writing to appellant for a loan of $48,200. If there had been a promise to make a loan an application would not have been necessary, and certainly so large a sum was not required, by the terms of the contract, to complete the sale. After appellee had been informed that the decree had been entered in the suit to quiet title, he wrote appellant on June 25, 1921, that he could not arrange to consummate the purchase by July 1 because the "papers must be examined again, and then I must have time to look after making my loan; I cannot make the loan until the abstracts are cleared and examined." Again, on July 2 he wrote that he could not make settlement by the 6th, "as I have to get those papers examined first, so you will have to give me time to make the loan." This letter, it is true, has appended to it: "P. S.—Will also kindly ask you if you would make the loan for six per cent even, without commission, the way you promised me at first," but this postscript is the language of inquiry to, rather than of an obligation on the part of, the addressee. Obviously, if there had been an understanding or agreement that appellant would make the loan some mention would have been made of it in appellant's letters, and appellee would scarcely have requested postponements of the consummation of the sale in order to negotiate a loan. We are convinced that appellee did not enter into the contract to purchase the land in reliance upon any promise of appellant to lend him the money necessary to consummate the purchase.

Appellee consulted Sam A. Brown, president of the bank at Cissna Park, with reference to the contract. He testi-

fied that Brown read those parts of the contract to him which stated the purchase price, the earnest money paid, the terms of payment and the advisability of obtaining a decree to remove his attorney's objections to the title.   He further testified that he understood the contract provided that he should take possession on March 1, 1921, that the sale should be consummated upon the entry of the decree, and that pending the decree the tenancy should be created. Hence every material part of the contract was either read to or understood by him.   Brown testified that pursuant to appellee's request he first read the entire contract to him and then explained it.   Moreover, at the meeting at which appellee signed the contract there were also present Malo, his attorney, and two of his sons.   It seems incredible that he did not know or understand the contents of the contract.

Appellee testified that at the meeting at the bank on December 17, 1920, Frazier, appellant's trust officer, threatened to sue him for damages if he did not sign the contract.   He is corroborated in this respect by his two sons. Brown, the banker whom appellee consulted, has no recollection of any such threat and Frazier denies making it. During the meeting, appellee testified, all retired from the room except Brown and himself; that Brown read parts of the contract; that then they talked about it, and that later he signed it.   Appellee acted deliberately, for he sought and received advice concerning the contract.   At the meeting there were present with him, Brown, Malo, and his two sons.   Frazier represented the appellant.   Under such circumstances he scarcely acted under duress.   He entered into possession of the land pursuant to the contract.   In none of his letters is there any reference to a threat, and he was not induced to sign the contract by any religious scruple against litigation, for he testified that his church did not forbid it.

Finally, it is contended that since the decree entered in the suit to quiet title is based upon constructive service it

313–25

is not final, and therefore appellee cannot be compelled to accept the title based upon such a decree. The contract recites that appellant is advised and believes that the title to the land is good and merchantable but that appellee's attorney deemed it best before appellee should complete the purchase that a decree be obtained removing certain objections which the attorney had raised to the title. The contract then provides that appellant will employ appellee's attorney, Malo, "to file a bill quieting said title as to the objections thereto raised by him, which it understands will make the title to said premises as shown by said abstract acceptable to said party of the second part," and that "when the said decree is rendered, then the party of the second part agrees to complete and make final payment for the premises in accordance with the conditions above set forth, the cash payment of one-third of the remainder of the consideration to be then made and the remainder to be secured by notes and mortgages as above set forth, all with six per cent interest from March 1, 1921." The relation of landlord and tenant temporarily created by the contract, it is expressly provided, shall exist "only until such time as such decree quieting the title shall have been rendered and the completion of the sale consummated in accordance with the conditions above set forth." Appellee testified that he knew when he signed the contract that it required him to complete the purchase upon the entry of the decree and that his tenancy would cease at that time. He also testified that he understood these provisions. He entered into them understandingly and they are binding upon him.

The contract, by implication if not expressly, requires appellant to convey to appellee a marketable title to the land. Complaint is made that the affidavit of unknown owners filed in the suit to quiet title is defective, and that instead of two affidavits, one of unknown owners and the other of non-residents, only one, purporting to answer the purposes of both, was filed. It is stated in the affidavit that

the unknown heirs and devisees of certain deceased persons "are severally persons who are interested in the above entitled cause whose names are unknown," etc. To say that the unknown heirs of a deceased person are unknown or that the names of his unknown heirs are unknown is without meaning, for, notwithstanding the statement, some or all of the decedent's heirs may be known. The affidavit did not state as a fact that the deceased persons named left unknown heirs or devisees. It was ineffective to make unknown persons parties to the suit. Moreover, the Chancery act contemplates the filing of two affidavits, one under section 7, to authorize the suit against persons whose names are unknown, by the name and description of unknown owners or unknown heirs or devisees of any deceased person, and another under section 12, to warrant notice to parties defendant by publication. *Wenner* v. *Thornton,* 98 Ill. 156.

A consideration of the objections which were raised to the title by appellee's attorney is therefore necessary. If those which the suit to quiet title sought to remove were without merit that suit need not have been brought. The objections, excluding those shown by the abstract continuation to have been removed by means other than the suit, are: (1) That the deed by the trustees of the Illinois Central Railroad Company, dated October 25, 1867, was not acknowledged in their trust capacity; (2) that marginal releases, one dated January 22, 1872, and the other October 7, 1854, both of mortgages, were not properly attested; (3) that the inventory of the estate of James Davis, deceased, filed August 16, 1880, was neither approved nor recorded, and that the description of the land is incomplete because the township and range were omitted; (4) that the identity of Wesley Davis with James W. Davis, of John Davis with John T. Davis, and of Edward Davis with Edward A. Davis, should be established; (5) that an affidavit of heirship of Zilla Davis, who died June 8, 1880, fails to

state that her debts were paid; (6) that the deed from John Chamberlain and wife to Mary Snyder, dated October 28, 1864, clouds title to a part of the land; and (7) that proof should be recorded that Irvin W. Baker, and Elizabeth, his wife, mortgagors in the mortgage to the Ætna Life Insurance Company, dated January 6, 1886, and Jacob Luebchow, and Sophia, his wife, grantors in the trust deed to Isaac M. Hamilton, trustee, dated February 21, 1896, both released, never claimed any interest in parts of the land.

The deed from the trustees of the Illinois Central Railroad Company was executed more than fifty years ago. Possession of the land was taken by James Davis, the grantee, pursuant to the deed, and held by him and his heirs until the latter conveyed the land to Cyrus N. Roberts, appellant's testator. The two mortgages, even if defectively released, one on October 7, 1854, and the other on January 22, 1872, have been long since barred by the Statute of Limitations. James Davis died in 1880, the land was inventoried, and the abstract shows that all claims against his estate were fully paid. While in the legal description of the land the township and range were omitted, it does not appear that the county was not stated. The proceedings to administer the estate of James Davis show that he left surviving, besides his widow and daughter, his sons, John, Edward and Wesley Davis. The guardian's petition to sell real estate shows that the same James Davis left his sons, John T., Edward and James W. Davis, surviving him, and the affidavit of John T. Davis, recorded October 4, 1881, is to the same effect. The warranty deed recorded March 25, 1882, shows that John T. and Edward A. Davis are two of the heirs of the same James Davis, deceased. Zilla Davis died June 8, 1880,—over forty years ago,—and all claims against her estate are barred. John Chamberlain and Orro L. Chamberlain, his wife, the grantors, and Mary Snyder, the grantee, in the warranty deed

dated and recorded October 29, 1864, Irvin W. Baker and Elizabeth Baker, his wife, the mortgagors in the mortgage to the Ætna Life Insurance Company, dated January 6, 1886, and Jacob Luebchow and Sophia Luebchow, his wife, the grantors in the trust deed to Isaac M. Hamilton, dated February 21, 1896, are all strangers to the title. A purchaser is not chargeable with notice of the record of any of these instruments. (*Kerfoot* v. *Cronin,* 105 Ill. 609; *Booker* v. *Booker,* 208 id. 529.) Cyrus N. Roberts acquired the title to the land in 1882 and owned and had uninterrupted possession of it until his death, on January 18, 1920. The abstract shows a complete and connected chain of title from the government to him. Apart from the suit the title was merchantable. If it were necessary, in order to establish a good title, that an abstract show a perfect paper title, without fault, defect or omission, although cured by existing facts or lapse of time, land could rarely, if ever, be sold. *Attebery* v. *Blair,* 244 Ill. 363.

This record does not justify the refusal to require specific performance of the contract made by the parties. The specific performance of a contract to convey land is as much a matter of course as an action of damages for its breach, and a court of equity will ordinarily grant such relief where the contract is valid at law, fairly entered into and unobjectionable in any of those features which address themselves to the chancellor's discretion. *Anderson* v. *Anderson,* 251 Ill. 415.

The decree will be reversed and the cause remanded, with directions to enter a decree in conformity with the prayer of the bill.

*Reversed and remanded, with directions.*